# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**VICTOR ROBERT BROWN,**
   **Plaintiff,**

  **v.**          **Case No. 20-C-319**

**DANIEL L. LAVOIE,**
**JAY VAN LANEN,**
**DREW WEYCKER,**
**JOSHUA GOMM,**
**TRISTAN RETZLAFF,**
**ALEX BONIS,**
**MICHAEL NEVEU,**
**MILES S. ARNE,**
**JUSTIN MAHER,**
**CO DAVID YANG,**
**JASON GIBBS, and**
**COLIN FRUEBRODT,**
   **Defendants.**

---

## <u>DECISION AND ORDER</u>

*Pro se* plaintiff Victor Robert Brown, a Wisconsin state prisoner, filed this civil rights case alleging that the defendants violated his constitutional rights when he was confined at the Green Bay Correctional Institution. The plaintiff is proceeding on Eighth Amendment claims based on allegations that (1) defendant Dr. Daniel LaVoie acted with deliberate indifference to his serious medical needs; and (2) defendants Jay Van Lanen, Justin Maher, Joshua Gomm, Tristan Retzlaff, Drew Weycker, Alex Bonis, Colin Fruebrodt, Michael Neveu, Miles Arne, David Yang, and Jason Gibbs failed to intervene

to stop Dr. LaVoie's deliberate indifference.[1] Before me now is the defendants' motion for summary judgment.[2]

## I. BACKGROUND

On August 21, 2019, at 7:45 a.m., Sergeant Gomm and Officer Fruebrodt found contraband in the plaintiff's cell. Officer Fruebrodt confiscated the contraband, and he informed the plaintiff he would receive a conduct report. At 11:30 a.m., the plaintiff struck and spit on Officer Fruebrodt after Officer Fruebrodt gave the plaintiff his lunch. Officer Fruebrodt issued the plaintiff a second conduct report for assaulting him. After striking and spitting on Officer Fruebrodt, the plaintiff covered his window and started banging on the door with what sounded like a metal object. The plaintiff told staff he had removed the mirror from his wall and put one of the screws into his arm. In his verified amended complaint, the plaintiff avers that he swallowed six pieces of metal, shoved a two-inch screw in the bend in his left arm, and told Lieutenant Weycker and Captain Van Lanen what he did. ECF No. 10 at 4.

The plaintiff was removed from his cell, secured in a restraint chair, and taken to the nurse's station. Nurse Larson (not a defendant) assessed the plaintiff and told him that Dr. LaVoie would look at his arm. The plaintiff, still in the restraint chair, was taken to a separate room while staff waited for Dr. LaVoie to arrive. Nurse Larson called Dr.

---

[1] On August 4, 2021, I granted the defendants' motion for partial summary judgment on exhaustion grounds on the plaintiff's claim that former defendant Officer Wisniewski did not allow hospital staff to use stitches on the plaintiff's arm wound. ECF No. 45.

[2] The defendants have also filed a motion to strike the plaintiff's unauthorized sur-reply, ECF No. 60, which I will deny. However, I note that the sur-reply does not add anything of substance to the issues under consideration.

2

LaVoie, informed him that the plaintiff had inserted a screw in his arm, and asked if he would attempt to remove the screw. Dr. LaVoie responded that he would remove the screw if the plaintiff consented.

The plaintiff consented to the removal of the screw. However, according to the plaintiff, Captain Van Lanen told the plaintiff that if he did not let Dr. LaVoie treat him, the plaintiff would receive a conduct report and that he would be strapped down in a restraint bed. Declaration of Victor Brown ("Brown Decl."), ECF No. 54, at p. 1. The defendants submitted video footage that shows an officer in a white shirt asking the plaintiff if he will let the doctor remove the screw and the plaintiff responding, "No." Declaration of David Yang, ECF No. 39, ¶ 4, Handheld Camera Video from August 21, 2019 ("Exhibit 1012"), at 23:40. About six minutes later, the officer in the white shirt returned and told the plaintiff that because he did not want to let the doctor remove the screw he would be placed in restraints "until we get the screw out. So why don't you let them try to get it out." Exhibit 1012 at 29:30. The plaintiff then consented. Exhibit 1012 at 30:00.

About twenty-five minutes later, the plaintiff was taken to see Dr. LaVoie. The video footage shows that the plaintiff, secured in the restraint chair and wearing a spit mask, was wheeled into an exam room. Exhibit 1012 at 51:30. Also present in the room were four officers in blue shirts with vest pads and helmets, one officer in a white shirt, a female nurse, Dr. LaVoie, and another male medical staff member. Exhibit 1012 at 51:30. The plaintiff avers that he told Dr. LaVoie that he was threatened and coerced to accept his treatment. Brown Decl. at p. 1-2. Dr. LaVoie is seen removing what appears to be ring-scissor forceps from a sterile plastic bag. After the plaintiff is secured in a position in which Dr. LaVoie can attempt removal of the screw, Dr. LaVoie approaches the plaintiff with the

3

forceps. The plaintiff states that he asked Dr. LaVoie if anesthetic would be used to numb his arm, and Dr. LaVoie said no. At that point, the plaintiff attempted to head-butt Dr. LaVoie to prevent him from attempting to remove the screw without anesthetic. At this point, the treatment stopped, and Lieutenant Weycker told the plaintiff that he would be placed into bed restraints. At about 12:45 p.m., the plaintiff was placed on the restraint bed. Exhibit 1012 at 1:05:30. He was assisted onto the bed and placed on his back with restraints on his ankles, across his legs, across his chest, and at his wrists.

The plaintiff avers that after he was secured on the restraint bed, Dr. Dorrow-Stevens (not a defendant) from the Psychological Services Unit told him that he would not be released from the restraint bed until he allowed Dr. LaVoie to remove the screw. Brown Decl. at p. 2. At about 3:00 p.m., Captain Van Lanen spoke to the plaintiff and was able to obtain his consent for Dr. LaVoie to again attempt to remove the screw from his arm. According to the plaintiff, he consented because he was in serious pain, nearing complete exhaustion, and experiencing dissociative feelings. *Id.*

When Dr. LaVoie entered the room where the plaintiff was on the restraint bed, the plaintiff requested anesthetic for the procedure. Brown Decl. at p. 2. Dr. LaVoie denied the plaintiff's request. The parties characterize Dr. LaVoie's attempt to remove the screw differently.

According to the plaintiff, he had another dissociative experience and, about one minute and 33 seconds after Dr. LaVoie started operating, the plaintiff returned to his body and asked LaVoie to stop by stating: "Alright, I need a break. I need a break!" but LaVoie did not stop, give him a break, or wait for his verbal consent to continue the rest of the procedure, causing the plaintiff extreme agony. *Id.* at 3. At one point, blood started

4

running out of the plaintiff's arm in a continuous stream. *Id.* The plaintiff avers that he gave Dr. LaVoie many verbal refusals to stop but he continued, and the plaintiff cried out in agony more than once. *Id.* The plaintiff also avers that, near the end, as the plaintiff "scream[ed] his head off" because he was in so much pain, defendants Maher, Retzlaff, and Van Lanen held him down. *Id.* Dr. LaVoie stopped after Captain Van Lanen ordered him to stop. *Id.* Before Dr. LaVoie left, he refused the plaintiff's request to give him something for the pain. *Id.* at 3-4.

According to the defendants, about two minutes after Dr. LaVoie started to try to remove the screw from the plaintiff's arm, the plaintiff asked for a break, yelped, and called Dr. LaVoie "fucker." Defs.' Proposed Findings of Fact ("DPFOF"), ECF No. 37, ¶¶ 18-19. The defendants state that Dr. LaVoie took a break from the treatment while Captain Van Lanen tried to reassure the plaintiff that they were removing the screw for his own health and safety. DPFOF ¶ 20. According to the defendants, the plaintiff remained calm during the break and did not revoke his consent to the treatment. DPFOF ¶ 21. The defendants state that about two-and-a-half minutes later, the plaintiff asked for an update, Dr. LaVoie reconfirmed the plaintiff's consent, and Captain Van Lanen continued to reassure the plaintiff that they were removing the screw for his own health and safety. DPFOF ¶ 22. A few seconds later, the plaintiff yelled, "Stop! Stop! Stop! Bitch! I'm refusing! Stop!," at which point Dr. LaVoie stopped his attempt to remove the screw. DPFOF ¶ 23.

At about 4:30 p.m., the plaintiff was taken to St. Vincent's Hospital for removal of the screw. The plaintiff avers that hospital health care personnel deemed it obvious that

he required local anesthetic for removal of the screw and that the procedure was completed without pain in less than three minutes. ECF No. 10 at p. 10.

Dr. LaVoie did not order anyone not to treat the plaintiff's wound but advised that sutures (stitches) should not be used because of the plaintiff's history of tearing them out, which exacerbates his wounds and delays healing. DPFOF ¶ 25. According to the defendants, the plaintiff's wound was treated to keep it closed and clean, although he interfered with the healing and often refused appropriate treatments. DPFOF ¶ 26. According to the plaintiff, as a direct result of Dr. LaVoie's order to leave the wound alone to heal with "secondary intention," his arm got infected twice and his wound did not heal until November. ECF No. 10 at p. 10.

## II. DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is required where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

6

**B. Analysis**[3]

The defendants contend that Dr. LaVoie cannot be held liable for deliberate indifference for attempting to remove the screw from the plaintiff's arm. According to the defendants, the record does not support a finding that Dr. LaVoie intentionally mistreated the plaintiff because the plaintiff put the screw into his own arm and consented to both attempts to remove the screw. The defendants also contend that the other defendants cannot be held liable for failing to interfere with Dr. LaVoie's treatment because, like Dr. LaVoie, none of the other defendants had any reason to think that the plaintiff did not consent to removal of the screw or that removing the screw would harm rather than help the plaintiff.

The plaintiff contends that it is obvious to a layperson that anesthetic is necessary for the removal of a screw and that no acceptable medical judgment could excuse Dr. LaVoie's refusal to use it. The plaintiff also contends that the defendants acted with deliberate indifference because Dr. LaVoie continued to try to get the screw out of his arm after he refused treatment and the other officers heard him refuse treatment and either continued to hold him down or did not act.

In screening the complaint, I allowed the plaintiff to proceed on Eighth Amendment claims for deliberate indifference to serious medical needs. In opposing the defendants'

---

[3] The defendants contend that because the plaintiff did not respond to the defendants' proposed findings of fact, the court should deem them undisputed. ECF No. 58 at 1. However, district courts are entitled to construe *pro se* submissions leniently and may overlook the plaintiff's noncompliance by construing the limited evidence in a light most favorable to the plaintiff. *See Grady v. Hardy*, 826 F.3d 1000, 1004-05 (7th Cir. 2016). The court has the benefit of the plaintiff's declaration (ECF No. 54) and his verified amended complaint (ECF No. 10), and the court will consider the information contained in the plaintiff's submissions where appropriate in deciding the defendants' motion.

7

motion for summary judgment, the plaintiff attempts to support his claim by arguing that he did not provide uncoerced consent to having the screw removed from his arm. However, lack of consent to the procedure is not relevant to the Eighth Amendment claim, which focuses on whether the plaintiff received constitutionally appropriate medical care, not on whether he gave his consent to receive care in the first place. Although a prisoner does have a qualified right to refuse certain forms of medical treatment, that right is protected by the Due Process Clause of the Fourteenth Amendment, not the Eighth Amendment. *See Washington v. Harper*, 494 U.S. 210, 213 (1990); *Knight v. Grossman*, 942 F.3d 336, 340–41 (7th Cir. 2019). I did not allow the plaintiff to proceed on any such due-process claim. Moreover, under the facts of this case, it is clear that the plaintiff did not have a due-process right to refuse treatment. A prisoner does not have a right to refuse treatment when "legitimate penological interests dictate that a particular treatment must be administered." *Knight*, 942 F.3d at 343 (quoting *Pabon v. Wright*, 459 F.3d 241, 252 (2d Cir. 2006)). Here, corrections officials obviously had a legitimate penological interest in treating the plaintiffs' arm. He had inserted a two-inch screw into the bend of his elbow, and leaving the screw and wound untreated would have posed unacceptable risks of infection and further medical complications. Thus, the plaintiff undoubtedly required treatment, and his only potential claim is that the defendants were deliberately indifferent in selecting the course of treatment that they initially administered: having Dr. LaVoie attempt to remove the screw without anesthetic. I now turn to that claim.

The Eighth Amendment "protects prisoners from prison conditions that cause the wanton and unnecessary infliction of pain, including . . . grossly inadequate medical care." *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019) (quoting *Pyles*

8

*v. Fahim*, 771 F.3d 403, 408 (7th Cir. 2014)) (internal quotations omitted). Not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To establish a valid Eighth Amendment claim, the plaintiff must show both that he "suffered from an objectively serious medical condition" and that the defendants were "deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)); *see also Estelle*, 429 U.S. at 103.

"A medical need is sufficiently serious if the plaintiff's condition 'has been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would perceive the need for a doctor's attention.'" *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (quoting *Greeno v. Daley*, 414 F.3d 645, 653 (7th Cir. 2005)). To establish whether a prison official is deliberately indifferent, a plaintiff must show that an official actually knew of and disregarded a substantial risk of harm. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Prison doctors may manifest indifference in their response to a prisoner's needs, by intentionally denying or delaying access to medical care, or by intentionally interfering with prescribed treatment. *Estelle*, 429 U.S. at 104-05. Mere negligence—i.e., a "mistake in professional judgment"—is not enough to escape summary judgment. *Gomez v. Randle*, 680 F.3d 859, 865-66 (7th Cir. 2012).

The court defers to a medical professional's treatment decision "unless no minimally competent professional would have so responded under those circumstances." *Lockett v. Bonson*, 937 F.3d 1016, 1023 (7th Cir. 2019) (quoting *Pyles*, 711 F.3d at 409). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to

9

establish an Eighth Amendment violation." *Id.* (quoting *Pyles*, 711 F.3d at 409). However, if evidence exists that the defendant knew better than to make the medical decision that he made, then summary judgment is improper, and the claim should be submitted to the jury. *Id.* (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662-63 (7th Cir. 2016)). The Court of Appeals for the Seventh Circuit has offered several ways the plaintiff could make such a showing at the summary judgment stage:

> State-of-mind evidence sufficient to create a jury question might include the obviousness of the risk from a particular course of medical treatment; the defendant's persistence in a course of treatment known to be ineffective; or proof that the defendant's treatment decision departed so radically from accepted professional judgment, practice, or standards that a jury may reasonably infer that the decision was not based on professional judgment.

*Id.* (quotations omitted) (quoting *Whiting*, 839 F.3d at 662-63). In addition, a medical professional's choice to pursue an "easier and less efficacious treatment" or "a non-trivial delay in treating serious pain" may also support a claim of deliberate indifference. *Id.* at 1023-24 (quoting *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010)).

The Seventh Circuit has decided a case applying these Eighth Amendment standards to a prison physician's decision to perform a minor medical procedure without anesthetic. In *Snipes v. DeTella*, 95 F.3d 586 (7th Cir. 1996), an inmate damaged his toenail, and the prison physician determined that the toenail needed to be removed. According to the inmate's allegations, while the physician was in the process of removing the nail, the inmate asked for "something to deaden the area first." *Id.* at 588. The physician said no, and, when the inmate said he was in pain and asked for local anesthetic again, the physician continued to refuse. *Id.* According to the inmate, the doctor said, "Forget it I know what I'm doing go back to your unit." *Id.* In addressing the plaintiff's

10

Eighth Amendment claim, the Seventh Circuit stated that the plaintiff's principal challenge was to "the doctor's decision not to administer a local anesthetic before removing his toenail." *Id.* at 591. The Seventh Circuit held that the refusal to use a local anesthetic was not, by itself, an act subject to Eighth Amendment scrutiny. Instead, it was only one part of an overall course of treatment for the toenail, and the correct question was whether the entire course of treatment complied with constitutional standards. *Id.* The court then found that the entire course of treatment was constitutional, reasoning as follows:

> What we have here is not deliberate indifference to a serious medical need, but a deliberate decision by a doctor to treat a medical need in a particular manner. [The plaintiff] disagrees with the way that treatment was administered, "but a 'mere disagreement with the course of [the inmate's] medical treatment [does not constitute] an Eighth Amendment claim of deliberate indifference.'"

*Id.* (citations omitted).

The Seventh Circuit did not stop there. It stated that "[e]ven if [the inmate's] desire for a local anesthetic could be considered a separable medical need under the Eighth Amendment (which it cannot), the denial of that need was not, 'objectively, sufficiently serious' to constitute the 'denial of the minimal civilized measure of life's necessities,' whatever the doctor's motive might have been." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)). The court reasoned as follows:

> A doctor's decision not to anesthetize a toe before removing a partially torn-off toenail—like the decision to remove a big splinter or stitch a cut without anesthetic—is not the type of barbaric treatment the Eighth Amendment was intended to prevent. To the extent such a decision is medically erroneous, it cannot be characterized as disregard for "an excessive risk to inmate health or safety." [The inmate's] health was not put at excessive risk by the extra pain he may have endured. Further, there is no presumption, as [the inmate] seems to think, in favor of deadening limbs before treating minor injuries. The administration of pain killers requires medical expertise and judgment. Using them entails risks that doctors must consider in light of the benefits. Injecting an anesthetic may involve the risk of nerve damage

11

or some other side effect (*e.g.*, an allergic reaction). Obviously major surgery cannot be performed without appropriate anesthetic. But this was hardly major surgery. It is even possible that an injection of anesthetic would have hurt more than quickly removing the nail. Nothing [the inmate] has alleged remotely strikes us as inhumane or a denial of the minimal necessities of a civilized society.

*Id.* at 591–92 (citations omitted). The court also rejected, as "absurd," the notion that "the Constitution requires prison doctors to administer the least painful treatment." *Id.* at 592. The court noted that, while such a result might be preferable, "the Constitution is not a medical code that mandates specific medical treatment." *Id.* The court stated:

Whether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference, except in the most extreme situations. A prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is "so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition."

*Id.* The court concluded that "[t]he pain [the inmate] experienced when his toenail was removed was not constitutionally serious and there is no evidence the failure to administer an anesthetic aggravated his condition." *Id.*

In light of *Snipes*, Brown cannot prevail on an Eighth Amendment claim based on Dr. LaVoie's decision to attempt removal of the screw without using local anesthetic. The decision not to use anesthetic cannot be separated from the overall course of treatment, and Brown's mere disagreement with Dr. LaVoie's treatment decisions does not establish an Eight Amendment violation. Here, Brown presents no evidence that LaVoie's attempt to remove the screw without local anesthetic was blatantly inappropriate from a medical standpoint. Although the attempt to remove the screw may have been more invasive than the removal of a toenail, it was not "major surgery" that "obviously" required some form of anesthetic. *Snipes*, 95 F.3d at 591. None of the videos of the procedure shows Dr. LaVoie

12

using a scalpel or other cutting instruments on the plaintiff. Instead, he used medical forceps in an attempt to extract the screw from the wound the plaintiff created when he inserted it. Although this may have been painful to the plaintiff, I cannot say that attempting to perform the procedure without anesthetic was "inhumane or a denial of the minimal necessities of a civilized society."[4] *Id.* at 592. Moreover, as stated in *Snipes*, the use of local anesthetic carries its own risks, such as nerve damage or an allergic reaction, and thus, absent evidence that no competent medical professional would have followed Dr. LaVoie's path, a jury could not second-guess his decision to proceed as he did. *Id.* at 591.

In his verified complaint, the plaintiff states that, after Dr. LaVoie attempted to remove the screw without anesthetic, prison staff brought him to a local hospital and that the health-care staff at the hospital "deemed it obvious" that he required anesthetic for the removal of the screw. (ECF No. 10 at 10, ¶ 59.) However, to the extent the plaintiff means to testify that staff at the hospital told him that it was "obvious" that anesthetic was required, his testimony would be inadmissible hearsay. Fed. R. Evid. 802. The plaintiff would be offering an out-of-court statement by the staff members for the truth of the matter asserted. Fed. R. Evid. 801. But to the extent the plaintiff means to testify that he observed staff at the hospital use anesthetic, his testimony is admissible. Still, the mere fact that

---

[4] I note that, although during the procedure the plaintiff was strapped into a chair and, later, strapped to a table, no evidence suggests that this was done to enable Dr. LaVoie to gratuitously inflict pain on the plaintiff. Rather, prison staff restrained the plaintiff in a chair in response to the initial incident at the plaintiff's cell. The plaintiff was later strapped to a restraint bed because he attempted to head butt Dr. LaVoie before Dr. LaVoie began the procedure. In other words, the plaintiff was strapped down for legitimate penological reasons, not to enable Dr. LaVoie to administer inhumane or barbaric treatment.

the hospital used anesthetic does not permit a reasonable jury to find that using anesthetic was the only medically acceptable choice. Again "[t]he administration of pain killers requires medical expertise and judgment," and different medical professionals may have different opinions about when anesthetic is required for minor procedures. *Snipes*, 95 F.3d at 591.

The plaintiff also brings Eighth Amendment claims against the remaining defendants—Van Lanen, Weycker, Gomm, Retzlaff, Bonis, Neveu, Arne, Maher, Yang, Gibbs, and Fruebrodt—for holding him down or standing by while he was asking Dr. LaVoie to stop and complaining that he was in pain. Because Dr. LaVoie did not act with deliberate indifference, these defendants are entitled to summary judgment on the plaintiff's claim that they failed to intervene in Dr. LaVoie's attempt to remove the screw. They are also entitled to summary judgment for the separate reason that, as non-medical professionals, they were entitled to rely on Dr. LaVoie to decide on the appropriate course of treatment, including whether to use a local anesthetic. *See Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017) ("Prison officials generally are entitled to rely on the judgment of medical professionals treating an inmate[.]").

Finally, the plaintiff brings an Eighth Amendment claim against Dr. LaVoie based on the orders he gave after the plaintiff returned to the prison from the hospital. At that time, Dr. LaVoie advised that the plaintiff should be given steri-strips and band-aids to help his wound heal. Dr. LaVoie advised that the plaintiff should not be given sutures (stitches) because he had a history of ripping them out. According to the plaintiff, the record does not support Dr. LaVoie's statement that he had a history of ripping out sutures. However, the record does not support the plaintiff's contention that Dr. LaVoie

14

refused to treat his wound when he returned. Rather, Dr. LaVoie chose one course of treatment (steri-strips and band-aids) over another (sutures). Again, the plaintiff's disagreement with this treatment decision does not amount to deliberate indifference. *See Lockett*, 937 F.3d at 1023.

## C.    Qualified Immunity

The defendants also contend that they are entitled to qualified immunity. The doctrine of qualified immunity shields public officials "from undue interference with their duties and from potentially disabling threats of liability." *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). More than a "mere defense to liability," it provides "immunity from suit." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" and "protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (internal quotation marks omitted). The doctrine "is an affirmative defense." *Sinn v. Lemmon*, 911 F.3d 412, 418 (7th Cir. 2018). "[O]nce the defense is raised, it becomes the plaintiff's burden to defeat it." *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008).

Whether qualified immunity applies turns on two questions: first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged violation. *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014) (per curiam). These questions may be addressed in either order. *Pearson v. Callahan*, 555 U.S. 223, 236–43 (2009)). "If either inquiry is answered in the negative, the defendant

15

official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019) (citation and internal quotation marks omitted).

Because I have already determined that the defendants are entitled to summary judgment on the plaintiff's Eighth Amendment claims, the first question regarding qualified immunity has been answered in favor of the defendants. For that reason alone, the defendants are entitled to qualified immunity. However, I also emphasize that, in light of *Snipes*, even if I am mistaken about whether Dr. LaVoie violated the Eighth Amendment when he attempted to remove the screw without anesthetic, Dr. LaVoie would be entitled to summary judgment under the second prong of the qualified-immunity analysis. *Snipes* states that, "except in the most extreme situations," "[w]hether and how pain associated with medical treatment should be mitigated is for doctors to decide free from judicial interference." 95 F.3d at 592. The plaintiff has not cited, and I have not found, any cases that would have given Dr. LaVoie fair notice that, despite these statements from *Snipes*, the constitution required him to use local anesthetic before attempting to use medical forceps to remove a screw that the plaintiff had inserted into his elbow as an act of self-harm. Accordingly, any right to anesthetic under these circumstances was not clearly established at the time Dr. LaVoie made his treatment decisions.

### III. CONCLUSION

For the reasons stated, **IT IS ORDERED** that the defendants' motion for summary judgment (ECF No. 35) is **GRANTED**.

**IT IS FURTHER ORDERED** that the defendants' motion to strike (ECF No. 60) is **DENIED**.

16

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within 30 days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. See Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed in forma pauperis on appeal, he must file a motion for leave to proceed in forma pauperis with this Court. See Fed. R. App. P. 24(a)(1).

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. See Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated at Milwaukee, Wisconsin, this 4th day of March, 2022.

s/Lynn Adelman
LYNN ADELMAN
United States District Judge

17